

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed July 29, 2011**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 11-30488-BJH-11 |
| IMPERIAL BEVERAGE GROUP, LLC, | § | |
| | § | Chapter 11 |
| Debtor. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Three Way Street Management, LLC's ("Three Way") Motion for Allowance of Post-Petition Rent As An Administrative Expense Under 11 U.S.C. § 503 (the "Motion"). Imperial Beverage Group, LLC ("Imperial"), the debtor in this chapter 11 case, opposes the Motion. The Court has jurisdiction over the parties and the issues raised in the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052.

The parties argued the Motion at a hearing held on June 22, 2011 (the "Hearing"), at which time the Court noted that Imperial had not cited any authority to support its arguments.

The Court directed Imperial to submit a post-Hearing brief citing legal authorities to support its position by June 29. The Court gave Three Way until July 7 to respond. Both briefs are now in; the Court has reviewed them and the record from the Hearing. For the reasons set forth below, the Court grants the Motion. Based on the Court's calculations, the Court finds that Three Way is entitled to a $13,634.13 administrative expense claim.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Imperial is a small wholesale wine distribution company specializing in boutique hand-crafted wines, which it sells primarily to retailers, restaurants, and hotels. Three Way was, until recently, Imperial's landlord. The relationship between the two began in 2004, when Imperial leased approximately 6,300 square feet of office and warehouse space at 1306 Motor Circle, Dallas, Texas (the "Office") from Three Way. The 2004 lease agreement provided for a one-year lease term that would automatically renew from year-to-year until either party terminated it on sixty days notice. If the lease terminated and Imperial did not vacate, Imperial would be "a day-to-day tenan[t], subject to all of the terms of th[e] [l]ease." (TW Ex. 2 at 3.)[1] Imperial's rent would "increase[] to an amount that is one-and-one half (1½) times the [b]ase [r]ent" at expiration or termination "computed on a daily basis for each day of the holdover period[.]" (*Id.*)

The 2004 lease agreement renewed automatically each year until 2008 when the parties decided to extend it to February 28, 2011, at which point the lease term would expire. Under the new agreement, "all of the provisions set forth in the [2004 lease] … remain[ed] in full force and effect," except that Imperial's monthly rent increased to $2,850[2] and would be due on the tenth

---

[1] "TW Ex." refers to Three Way's exhibits admitted at the Hearing.

[2] In fact, the lease modification first increased Imperial's base rent to $2,700 per month beginning on March 1, 2008. The $2,850 amount is used here, however, since that became Imperial's rent as of March 1, 2009 and remained so throughout the time period relevant to the Motion.

of the month for the month in question, instead of the first (the lease agreement, as modified, is referred to herein as the "Lease").  (TW Ex. 3 at 1.)

Sometime in mid-2010—the evidence is unclear precisely when—Imperial stopped paying its monthly rent in full.  In November 2010, it quit paying rent altogether.  Three Way then locked Imperial out of the Office.  After the lockout, Imperial needed Three Way's permission to access the Office and get at its personal property, inventory, and business records. On a couple of occasions the parties tried but failed to agree on a date for Imperial to remove those items.  Initially, Three Way suggested that Imperial take everything out of the Office except the office furniture, which Three Way intended to keep in partial satisfaction of Imperial's unpaid rent.

By early-January 2011 nothing had changed; Imperial's property and records remained in the Office.  Accordingly, on January 6, 2011, Three Way filed a complaint for eviction in Dallas County state court seeking possession of the premises as well as $15,575 in unpaid rent and $121 in attorney fees and costs.  On January 19, 2011, the state court entered a default judgment in Three Way's favor.  After obtaining its judgment, Three Way intended to (i) execute upon a writ of possession entered by the state court, (ii) remove Imperial's property from the Office, and (iii) re-let the Office to a new tenant.  But, on January 21, 2011, Imperial filed for bankruptcy protection and the Bankruptcy Code's automatic stay barred Three Way from executing upon the writ.

In early February 2011, in an attempt to get back into the Office, Imperial's counsel called and emailed Adam Curran ("Curran"), Three Way's interim property manager.  Curran did not respond.  On February 28, 2011, Imperial's counsel emailed Curran stating that Three Way was "in possession of [Imperial's] books and records, including computer equipment," and

**Memorandum Opinion and Order**

3

demanding "immediate turnover and an accounting of such items." (Imp. Ex. C.)[3] The email continued, "any attempt to dispose of such items or any other property belonging to Imperial will constitute a violation of [the automatic stay]." (*Id.*) At that point Three Way hired counsel and agreed to let Schnell Blanton ("Blanton"), Imperial's founder, CEO, and sole employee, into the Office for half an hour the next day (March 1, 2011) so that she could retrieve Imperial's mail, records, and computers.

Once there, Blanton noticed that some of Imperial's furniture was missing from the Office, including an armoire, office chairs, a refrigerator, and, most disconcerting to Blanton, file cabinets containing Imperial's business records. Upset, Blanton called Imperial's counsel, who later learned that before Imperial filed for bankruptcy, Three Way had hired movers to take most of Imperial's furniture to the offices of Mercer Company, Three Way's property manager. Even with these items gone, other property belonging to Imperial remained in the Office – *i.e.*, some furniture, cases of wine, large industrial-strength shelving that Imperial used to store heavy pallets of wine, and trash.

After Blanton's March 1 visit to the Office, counsel for Imperial and counsel for Three Way exchanged several emails in which they attempted to schedule a time for Blanton to return to the Office. Both counsel expressed an eagerness to get Imperial access to the Office. Imperial's primary concern was "inspect[ing] the property and determin[ing] what is missing or has been damaged." (TW Ex. 7.) In contrast, Three Way was "anxious to have Imperial['s] [] property out of the premises so that [it] may be shown and re-let to a new tenant." (*Id.*) They ultimately agreed to meet at the Office on March 9, 2011, at which time they conducted a walk-through and began compiling an inventory. Imperial also started packing up its business files,

---

[3] "Imp. Ex." refers to Imperial's exhibits admitted at the Hearing.

which, to its dismay, Three Way's movers had haphazardly removed from file cabinets and put into large trash bags.

After the March 9 visit, Imperial asked for, and received, access to the Office on five further occasions: March 14, 25, 28, 30 and April 1 through 4. On the first three of these occasions Imperial showed the metal warehouse shelving to potential bidders and continued packing up its files. On the final two occasions, which included unlimited access over the April 1 weekend, Imperial was to have boxed up and removed its remaining property from the Office.

All told, Blanton spent about a week packing up materials. She worked between four and six hours per day, alone at first, and then with friends who had volunteered to help out. Most of what Imperial removed went to a new less-expensive office that the Court permitted Imperial to lease by Order dated March 30, 2011.[4] But, by mid-April, despite significant access to the Office and Blanton's efforts, Imperial still had not vacated the Office. Trash, furniture and the metal warehouse shelving, for which no buyer had been found, remained in the Office.

At some point after that, one of Three Way's investors, unaware of Imperial's bankruptcy filing, entered the Office, took down the metal shelving, and sold it for scrap value of $300. When Three Way's counsel learned later what had happened, she offered to replace the shelving, but Imperial declined that offer because the shelving would not fit in the warehouse space at its new office.

On April 8, 2011, Three Way filed the Motion, seeking the allowance of an administrative expense for post-petition rent. Thus, even though this dispute had been brewing for months, neither party asked the Court for any kind of relief until Three Way filed the Motion. Imperial filed its response in opposition to the Motion on May 2. As of the date of the Hearing,

---

[4] The March 30 Order [Docket No. 36] was an interim order, which became final by Order entered on April 26, 2011 [Docket No. 43].

**Memorandum Opinion and Order**

Imperial still had furniture and trash in the Office. At the conclusion of the Hearing, the Court ordered Imperial to vacate the Office by June 29, 2011.[5]

## II.    SUMMARY OF THE ARGUMENTS

Three Way seeks the allowance of an administrative expense claim in the amount of $13,061.29, plus an additional $95 per day from the Hearing date until Imperial fully vacated the Office.[6] In other words, Three Way's claim is based upon Imperial's unpaid rent at the contract rate from the January 21, 2011 petition date until June 29, 2011 when Imperial finally vacated the Office. As support for its position, Three Way points first to § 365(d)(3) of the Bankruptcy Code, which it claims "mandates" an administrative expense priority for any unpaid rent obligations Imperial incurred between the petition date and May 21, 2011, when it asserts the Lease was deemed rejected by operation of § 365(d)(4)(A). *See* (Motion at 6.) Three Way then points to § 503(b)(1)(A),[7] and argues that Imperial's rent obligations after May 21 were an "actual [and] necessary cost[] [or] expense[] of preserving the estate" and so should be added to Three Way's administrative expense claim. *See* (TW Post-Hrg. Br. at 6.)[8]

In response, Imperial denies that Three Way's claim should receive an administrative expense priority at all. Imperial first argues that the Lease terminated on January 19, 2011, when

---

[5] Three Way's post-Hearing brief states that Imperial in fact vacated the Office on June 29, 2011. Imperial has not disputed that fact, and the Court therefore assumes its truth for the purposes of this decision.

[6] Three Way calculated its $13,061.29 claim by first prorating Imperial's $2,850 base rent for the ten days in January that remained after Imperial's bankruptcy filing. To that it added the full base rent for February and a holdover rate of $95 per day for each day from the February 28th lease expiration date to the Hearing. Though the lease permits Three Way to charge a holdover rate at 1½ times the base rent, Three Way has chosen not to exercise that right. It has also reduced its requested administrative expense claim by $1,440, on account of what happened to Imperial's warehouse shelving. That amount, which Imperial stipulated to, reflects an auction value for the shelving of $1,600, minus a ten percent auctioneer's commission.

[7] Section 503(b) provides, as relevant here:

> (b) "After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under [§] 502 (f) of this title, including—
>> (1)
>>> (A) the actual, necessary costs and expenses of preserving the estate …"

[8] "TW Post-Hrg. Br." refers to Three Way's Response To Debtor's Supplemental Brief. [Docket No. 66.]

Three Way prevailed in its eviction action and got a writ of possession. Alternatively, Imperial contends that because "[a]dministrative expenses are left to § 503"—not § 365(d)(3), as Three Way suggests—Three Way's administrative expense claim is limited to the value of the "real benefit" Imperial's bankruptcy estate received from using the Office post-petition. (Imp. Post-Hrg. Br. at 3.)[9] That value, according to Imperial, "is closer to $500 a month"—the amount that Imperial could have paid to rent additional storage space at its new facility—"than [it is to] $2,850, and [any allowed administrative expense claim] should be adjusted accordingly." (*Id.* at 7.) Notably, Imperial agrees with Three Way that after May 21, when the Lease was deemed rejected, Three Way's "administrative rent claim is governed by the benefit standard of [§] 503(b)(1)(A)." (*Id.* at 8.) But, Imperial thinks that since it "had, at best, sharply restricted access to the [Office] … Three-Way['s administrative expense claim] must be reduced" to reflect that. (*Id.*)

## III. LEGAL ANALYSIS

### A. The Effect of the Unexecuted Writ of Possession on the Lease

Section 365(d)(3) provides, as relevant here:

> The trustee [or debtor-in-possession] shall timely perform all the obligations of the debtor, … arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding [§] 503(b)(1) of this title.

11 U.S.C. § 365(d)(3). Section 365(d)(3) applies to "true" leases of commercial property that are unexpired on the petition date. *See In re PCH Assocs.*, 804 F.2d 193, 198 (2d Cir. 1986) ("We interpret [§] 365(d)(3) of the [] Code to apply solely to a 'true' or 'bona fide' lease."); *In re Oerke*, 63 B.R. 1, 2 (Bankr. N.D. Tex. 1986) (holding true leases subject to § 365). There is no

---

[9] "Imp. Post-Hrg. Br." refers to Debtor's Supplemental Brief With Respect To Three Way Street Management, LLC's Motion For Allowance Of Postpetition Rent As An Administrative Expense Under 11 U.S.C. § 503. [Docket No. 60.]

dispute that the Lease is a true lease.  But, the parties disagree about whether the Lease was in effect on the petition date.  According to Imperial, the Lease terminated when the state court granted Three Way a default judgment in its eviction action, which allowed Three Way to get a writ of possession for the Office.  However, Three Way responds that it never executed the writ, so that on the petition date the Lease remained effective.

The Court agrees with Three Way.  Imperial has not cited any authority supporting its contention that the Lease terminated upon the entry of the default judgment, and the Court's independent research has turned up nothing to cause it to doubt the common-sense conclusion that a default judgment and unexecuted writ of possession did not terminate the Lease, which was set to expire on February 28, 2011.  While Three Way took the default judgment and got a writ of possession on January 19, 2011, when Imperial filed for bankruptcy on January 21, 2011, the writ remained unexecuted.  And, of course, once Imperial filed for bankruptcy, the automatic stay blocked Three Way from taking any action to execute the writ and evict Imperial from the Office.

Accordingly, the Lease was, as of the petition date, an unexpired lease to which § 365(d)(3) applied.

**B.      The Code's Basis for Three Way's Administrative Expense Claim**

When a debtor files for bankruptcy, its obligations under an unexpired lease do not automatically become obligations of the bankruptcy estate.  Instead, the debtor has a period of time after the petition date to decide whether to assume or reject the lease.  For commercial real property leases in which the debtor is the lessee, it gets at least 120 days to make that decision (unless a plan of reorganization is confirmed prior to that time).  11 U.S.C. § 365(d)(4).  During that time the automatic stay stops the landlord from terminating the lease.  If the debtor elects to

assume the lease any unpaid rent gets addressed by § 365's mandate that the debtor either cure the payment default or give the landlord adequate assurance that the payment default will be promptly cured.  11 U.S.C. § 365(b).  But, if the debtor elects to reject the lease, the Code has no similar provision requiring the debtor to bring its rent current.  Thus, as one court put it, if the debtor rejects the lease "an issue arises as to the nature of the [landlord's] remedy for recovering [rent] payments for the post-petition period during which the trustee was deciding to reject the lease and during which the estate possessed, and perhaps used, the property."  *CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229, 234 (4th Cir. 2005).  Congress enacted § 365(d)(3) to address this problem, at least in part.

As noted previously, § 365(d)(3) provides that the debtor "shall timely perform all the obligations of the debtor … arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding [§] 503(b)(1) of this title."  Congress added this section to the Code as part of the so-called "Shopping Center Amendments" included in the Bankruptcy Amendments and Federal Judgeship Act of 1984.  *In re Stone Barn Manhattan LLC*, 398 B.R. 359, 360 (Bankr. S.D.N.Y. 2008).  Before the amendments, if a debtor rejected its commercial real property lease the landlord's remedy was to assert an administrative expense under § 503(b)(1)(A).  *In re Amber's Stores, Inc.*, 193 B.R. 819, 821 (Bankr. N.D. Tex. 1996).  However, that section only compensates the landlord for the debtor's "actual, necessary costs and expenses of preserving the estate."[10]  In other words, the landlord's administrative expense claim did not automatically equal the full amount of the rent due under the lease.  Congress perceived that result to be unfair to landlords because, unlike other creditors who could simply choose to stop doing business with the debtor post-petition, landlords were stuck with the debtor while it decided whether to assume

---

[10] *See* footnote 7, *supra*.

or reject the lease, during which time the debtor was not paying rent and the landlord could not re-let the space. *See In re At Home Corp.*, 392 F.3d 1064, 1068 (9th Cir. 2004). The Shopping Center Amendments, and § 365(d)(3) specifically, "solved this problem by ensuring that debtors continued to perform obligations under commercial leases, including the obligation to pay rent, notwithstanding the consideration of any benefit to the bankruptcy estate." *In re Burival*, 406 B.R. 548, 553 (B.A.P. 8th Cir. 2009); *see In re HA-LO Indus., Inc.*, No. 02 C 3967, 2002 WL 31628221, at *4 (N.D. Ill. Nov. 20, 2002) ("Several Courts of Appeals … have agreed that § 365(d)(3) was intended to relieve landlords from the burden of proving that the rent payments they sought to collect from debtors prior to rejection were 'actual and necessary' costs of preserving the bankruptcy estate.").

In enacting § 365(d)(3) Congress may have resolved one question while raising another. Put simply, what remedy does a landlord have when a debtor ignores § 365(d)(3) and fails to pay post-petition rent timely? *See In re Amber's Stores*, 193 B.R. at 822 ("[W]here the debtor has not made the post-petition, pre-rejection lease payments required under § 365(d)(3), and then subsequently rejects the lease, there is a question as to how the unpaid rental payments should be treated by the court."); *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 933 (Bankr. W.D. Tex. 1994) ("The most fundamental issue encountered by the courts where a lease is rejected and the debtor has failed to meet all of its post-petition lease obligations … concerns the treatment of the lessor's claim.").

Several courts, as well as the parties here, suggest that two lines of cases have developed around this question, both offering a different answer. The majority view holds that § 365(d)(3) gives a landlord an automatic administrative expense for post-petition lease obligations that arise while the debtor decides to assume or reject the lease. *See generally* 3 *Collier on Bankruptcy* ¶

365.04[1][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) (discussing majority view and collecting cases). According to these courts, the landlord's right to an administrative expense is triggered by § 365(d)(3) alone, and the landlord need not show the estate received a benefit under § 503(b)(1). *See, e.g., Augusta Mall Pshp. v. Twigland Fashions (In re Twigland Fashions)*, 198 B.R. 199, 200 (W.D. Tex. 1996) ("[M]ost of the courts to address the issue have held that Section 365(d)(3) plainly requires that unpaid nonresidential lease obligations be accorded priority status as an administrative expense of the estate, without proof of the necessity and benefit otherwise required by Section 503(b)(1)(A)."). These courts take the position that "[b]y providing for timely performance of *all* lease obligations, 'notwithstanding [§] 503(b)(1),' the statute has already granted priority payment status to the full amount of rent." *Towers v. Chickering & Gregory (In re Pacific-Atlantic Trading Co.)*, 27 F.3d 401, 404 (9th Cir. 1994). This is the view Three Way asks the Court to adopt here.

In contrast, the minority view holds that regardless of what appears to be § 365(d)(3)'s clear language to the contrary, the only way a landlord can assert an administrative expense for unpaid post-petition, pre-rejection rent is through § 503(b)(1)(A). *See generally* 3 *Collier on Bankruptcy*, *supra* (discussing minority view and collecting cases). And, the landlord's recovery is limited to an amount equal to the benefit of the debtor's actual and necessary use of the property, which can be far less than the rent provided for in the lease. *See In re Palace Quality Servs, Indus, Inc.*, 283 B.R. 868, 878 (Bankr. E.D. Mich. 2002). This is the view Imperial asks the Court to adopt here.

However, both the majority and minority views present problems that make them unpalatable. The Court of Appeals for the Fourth Circuit highlighted many of the problems in *In re Midway Airlines Corp.*, 406 F.3d at 229-42. In *Midway Airlines*, a company that had leased

telephone equipment to the debtor pre-petition asserted an administrative expense claim under former § 365(d)(10)[11]—a section similar to and modeled on § 365(d)(3)[12]—for past due post-petition lease payments at the contract rate. Before allowing the lessor's administrative expense claim in full, the *Midway Airlines* court considered and rejected both approaches. First, it disagreed with the majority view that § 365(d)(3) provides a basis for the court to allow an administrative expense that is independent of § 503(b)—the section of the Code that specifies the kinds of administrative expenses that are allowable. After all, as the *Midway Airlines* court pointed out, only "administrative expenses allowed under [§] 503(b)" receive first priority under the Bankruptcy Code's priority scheme. *Id.* at 238. And, according to the *Midway Airlines* court, an independent § 365(d)(3) administrative expense is "[n]otably absent from the list of priorities" in § 503(b). *Id.* Thus, even if § 365(d)(3) created an independent administrative expense claim, the Bankruptcy Code's plain language precludes "the conclusion that [such a] claim is entitled to priority comparable to that of a § 503(b) claim." *Id.* Indeed, the *Midway Airlines* court's analysis calls into question whether such a claim could be paid at all.

A second problem the *Midway Airlines* court noted with respect to the majority view arises when a bankruptcy case is converted from chapter 11 to chapter 7. When that happens, post-petition, pre-conversion claims generally lose their priority over other pre-petition claims. *See* 11 U.S.C. § 348(d). "The only type of claim … specifically except[ed] from [this] general rule is 'a claim specified in [§] 503(b).'" *In re Midway Airlines Corp.*, 406 F.3d at 238. But, because the majority view grounds the landlord's administrative expense claim in § 365(d)(3),

---

[11] In 2005, the Code was amended and former § 365(d)(10) was renumbered as § 365(d)(5). The amendment did not, however, alter the language of former § 365(d)(10).

[12] Though § 365(d)(10) and § 365(d)(3) are not identical, "[s]ection 365(d)(10) is modeled on … § 365(d)(3)[;] …both sections impose a duty of timely performance on debtors ... and both expressly specify that this duty exists 'notwithstanding [§] 503(b)(1)' of the Code." *In re Midway,* 406 F.3d at 234 (quoting *In re E. Agri-Sys., Inc.*, 258 B.R. 352, 354 (Bankr. E.D.N.C. 2000)). Further, "in construing § 365(d)(10), courts often look to decisions construing § 365(d)(3)." *Id.*

not § 503(b), it follows that "[a]fter [] conversion a [§ 365(d)(3)] claim would be equivalent in priority to pre-petition, unsecured claims but subordinated to all other post-petition § 503(b) administrative expense claims." *Id.* Such a strange result contradicts Congress's intent in enacting § 365(d)(3)—that landlords should receive the full amount of unpaid post-petition, pre-rejection rent. Instead, according to the *Midway Airlines* court, the majority view weakens the landlord's ability to collect that rent if a case gets converted. *Id.* at 238-39. It should come as no surprise then that "[t]he lack of a better explanation for how, under the Code, an independent [§ 365(d)(3)] administrative expense claim retains its priority after conversion caused at least one court to adopt the minority interpretation." *Id.* at 239 (citing *In re Palace Quality*, 283 B.R. at 878).

But, the minority view also has flaws. Most significantly, according to the *Midway Airlines* court, it fails to give full effect to § 365(d)(3)'s plain language, which entitles the landlord to receive *all* of the post-petition, pre-rejection rent the debtor owes under the lease, "*notwithstanding [§] 503(b)(1)*." *See In re Midway Airlines*, 406 F.3d at 236-37. The minority view also flouts Congress' intent to bar debtors from using § 503(b)(1)(A) to avoid paying their landlords the full amount of that rent. *Id.*

After noting the problems, the *Midway Airlines* court suggested a "mid-way," which "lies somewhere between the majority and minority positions." *In re Midway Airlines Corp.*, 406 F.3d at 238; *see* 3 *Collier on Bankruptcy*, *supra* (evaluating the *Midway Airlines* approach in light of other approaches and finding that the *Midway Airlines* approach "seems warranted"); *In re Lakeshore Const. Co. of Wolfeboro, Inc.*, 390 B.R. 751, 760 (Bankr. D. N.H. 2008) (following *Midway Airlines*); *In re Double G Trucking of the Arlatex, Inc.*, 442 B.R. 684, 689-90 (Bankr. W.D. Ark. 2010) (same). Under the *Midway Airlines* approach "a [landlord] must still assert its

administrative expense claim under § 503(b); it simply does not assert the claim under the specific provision of § 503(b)*(1)(A)*." *In re Midway Airlines Corp.*, 406 F.3d at 236 (emphasis in original).

Without citing *Midway Airlines*, the Court of Appeals for the Eight Circuit recently applied the same reasoning and awarded an administrative expense claim to a landlord whose tenant (the debtor) had not paid post-petition, pre-rejection rent. *In re Burival*, 613 F.3d 810 (8th Cir. 2010). There, the debtor filed for bankruptcy two days before a $90,799.22 rent payment fell due under its lease. *Id*. at 811. The debtor's landlord then asserted an administrative expense claim for that amount under § 365(d)(3), while the debtor argued to limit the administrative expense to the reasonable value of the premises. *Id*. at 811-12. In ruling for the landlord, the court observed that "[r]ent obligations in [unexpired leases of nonresidential real property] must be performed when they arise after filing and before rejection; any reduction based on [§] 503(b)(1) would violate the specific language of § 365(d)(3)." *Id*. at 812. And, like the Fourth Circuit in *Midway Airlines*, the *Burival* court noted that "the administrative expenses listed in the subsections of § 503(b)—preceded by 'including'—are not exclusive." *Id*. Thus, a § 365(d)(3) claim's priority status comes from "the introductory authorization of 'administrative expenses' in § 503(b)." *Id*.

This Court finds the reasoning of the *Midway Airlines* and *Burival* courts persuasive. These courts, by concluding that § 365(d)(3) allows a landlord to recover an administrative expense under § 503(b), avoid the problems created by the majority and minority approaches described above. Specifically, grounding the landlord's administrative expense claim in § 503(b) permits the landlord's claim to fit within § 507(a)'s priority payment scheme so that the claim retains its priority status should the case convert to chapter 7. At the same time, the *Midway*

*Airlines* and *Burival* courts gave proper regard to § 365(d)(3)'s admonition that the landlord receive the debtor's performance of all lease obligations "arising from and after the order for relief … until such lease is assumed or rejected." It is for these reasons that the Court adopts the *Midway Airlines and Burival* approach here.

### C. Determining the Amount of Three Way's Allowed Administrative Claim

Calculating the amount of Three Way's administrative expense claim proves more complicated than it first appears. Three Way contends that it should receive an administrative expense at the contract rate beginning on the January 21, 2011 petition date and concluding on June 29, 2011, when Imperial finally vacated the Office. However, the Court can identify four distinct periods of time from the petition date to June 29, 2011, and the Court must determine the allowable amount of Three Way's administrative claim for each period.

The first period is the so-called "stub rent period," which extended from the January 21 petition date to January 31. The second period is the month of February 2011 (prior to the expiration of the Lease on February 28). The third period is from March 1 to May 21 (when the Lease would be deemed rejected under § 365(d)(4) (assuming it remained unexpired on that date)). Finally, the fourth period is from May 22 (the day after the statutory Lease rejection date) to June 29 (the date Imperial vacated the Office). The Court must determine what amounts Three Way may claim as an administrative expense for each of these periods.

*1. The Stub Rent Period: January 21, 2011 through January 31, 2011*

One commentator has explained stub rent as "[t]he rent owed by a debtor to the landlord for the period from the petition date until the first day of the next following month." 1 *Collier Guide to Chapter 11: Key Topics and Selected Industries* ¶ 20.06[6][a] (2010). Courts disagree over whether § 365(d)(3) provides a landlord with a claim for stub rent as an administrative

expense.  Those addressing the issue have traditionally adhered either to a "proration theory," under which stub rent becomes an administrative expense, or to a "billing theory," under which it does not.  *See In re GCP CT Sch. Acquisition, LLC*, 443 B.R. 243, 254 (Bankr. D. Mass. 2010) (noting "a substantial split of authority" and collecting cases on both sides); *In re Phar–Mor, Inc.*, 290 B.R. 319, 324 (Bankr. N.D. Ohio 2003) (same).  The proration theory contemplates that the debtor's rent obligations "arise" on a daily basis post-petition.  *In re Stone Barn*, 398 B.R. at 365 (holding rent arises on a daily basis and per diem stub rent arising post-petition entitled to timely payment under § 365(d)(3)).  This triggers the debtor's obligation under § 365(d)(3) to pay for each day of use during the stub rent period at the per diem contract rate.  If the tenant does not pay the stub rent, the landlord may seek an administrative expense.  *In re UAL Corp.*, 291 B.R. 121, 127 (Bankr. N.D. Ill. 2003) (holding stub rent entitled to an administrative expense under [§] 503(b)(1)(A)).

From this Court's perspective, the problem with the proration theory is that it ignores § 365(d)(3)'s requirement that the debtor's obligation to pay rent must "arise … *under [the] unexpired lease.*"  Here, as in most cases, Imperial had no obligation *under the Lease* to pay rent during the stub period because its first post-petition rent obligation under the Lease did not fall due until February 10.  The Court, therefore, will not adopt the proration theory in this case.  Rather, this Court concludes that the billing theory offers the better approach.  Under that theory "stub rent is not an obligation that must be timely performed under [§] 365(d)(3) since the bill came due prior to the order for relief, … [but] the landlord's claim for stub rent is nevertheless entitled to administrative expense priority under [§] 503(b)[(1)(A)]" if the landlord can show the stub rent was an actual and necessary expense of preserving the debtor's estate.  1 *Collier Guide to Chapter 11*, *supra*, ¶ 20.06[6][c] (describing so-called "modified" billing approach); *see In re*

*Goody's Family Clothing Inc.*, 610 F.3d 812, 818 (3d Cir. 2010) (holding "[l]andlords may assert a § 503(b)(1) claim for 'stub rent'").

Here, Three Way showed that a significant amount of Imperial's property remained in the Office during the stub rent period, including wine inventory and the metal warehouse shelving— what were thought to be among Imperial's most valuable assets.[13] So, Imperial's estate certainly benefitted from storing its property at the Office post-petition. After all, Imperial had no other option; it did not lease its new facility until approximately two months later. Significantly, the record reflects that Imperial never even tried to contact Three Way during the stub rent period. Rather, Imperial's first post-petition attempt to contact Three Way happened in early February. The Court finds, therefore, that Imperial's use of the Office during the stub rent period was an actual, necessary expense of preserving Imperial's estate. Three Way should be compensated for that use as an administrative expense under § 503(b)(1)(A) .

In determining the amount of Three Way's administrative expense claim for this period, the Court must determine the amount of benefit received by the estate, which is presumed to be the contract rate of rent. *In re Sportsman's Warehouse, Inc.*, 436 B.R. 308, 315 (Bankr. D. Del. 2009). Imperial can rebut that presumption by submitting "evidence that the benefit to the estate is lower than the contract rate." *Id*. "That evidence may include, but is not limited to, proof of the fair market value of rent." *Id*. In turn, the court may factor in what the landlord "charges for the rental of comparable space [as well as] the condition and marketability of the property." *In re Patient Educ. Media, Inc,*, 221 B.R. 97, 104 (Bankr. S.D.N.Y. 2002).

Because Imperial's monthly rent under the Lease was $2,850, Three Way's administrative expense claim for the stub rent during the last ten days of January is presumed to

---

[13] According to Imperial's bankruptcy schedules the wine inventory at the Office was worth $65,000, and the metal shelving $7,500. Imperial's total assets were $85,941. [Docket No. 18.]

**Memorandum Opinion and Order**

have accrued at the rate of $91.93 per day. While Imperial attempted to rebut the presumption, its evidence was unpersuasive as explained below.

Blanton, Imperial's representative, testified that the $2,850 monthly rent was excessive post-petition since Imperial was not operating out of the Office and could rent additional storage space at its new facility for $500 per month. (Hrg. Tr. at p. 52, 19–23.) Based on that testimony, Imperial asks the Court to find that the benefit the estate received from storing its property at the Office should be valued at "closer to $500 a month than $2,850," and to adjust Imperial's administrative expense claim accordingly. (Imp. Post-Hrg. Br. at 7.)

The Court declines to do so for the following reasons. First, Imperial offered no evidence that this "additional" storage space at its new location was even available to it in January. As noted previously, Imperial was permitted to lease its new space by Order entered March 30, 2011.

Second, Imperial offered no evidence that the "additional" storage space at its new location (even assuming it was available in January) was comparable to the Office, or that $500 was a fair market rental value for storing property *at the Office*. *See In re Patient Educ.*, 221 B.R. at 104 (holding the court is "concerned with the reasonable value of what it cost to store [property] *at that location*[;] … [t]here is no rule that measures reasonable value by the cheapest alternative." (emphasis added)).

Third, when Blanton was asked if this "additional" storage space at Imperial's new location could have housed the items remaining in the Office, she admitted she was not sure – particularly with respect to the warehouse shelving. (Hrg. Tr. at p. 66, 9–21.) Given that admission, the Court is not inclined to infer that Imperial's estate would have received the same

degree of benefit from storing its property in its new location, even assuming that its new location was available to it during the stub rent period.

Fourth, while some courts have calculated administrative claims under § 503(b)(1) based upon the percentage of the premises the debtor uses post-petition, this Court cannot do so on this record. *See In re Homeowner's Outlet Mall Exchange, Inc.*, 89 B.R. 965, 970 (Bankr. S.D. Fla. 1988) (holding where trustee did not occupy entire premises, administrative claim allowable *pro-rata* only for square feet trustee "actually occupied"); *In re Cardinal Indus.*, 109 B.R. 738, 741 (Bankr. S.D. Ohio 1989) (finding debtors occupation of one-third of leased space post-rejection reduced benefit to estate, and fashioning administrative claim at one-half of the contract rate). Thus, even if that methodology is sound, the Court simply has no idea what percentage of the Office Imperial's property occupied. In fact, the undisputed evidence is that Imperial's property was strewn throughout the Office – at least during the stub rent period.

Finally, Imperial failed to introduce any evidence that $2,850 does not reflect the fair market rental rate for the Office. To the contrary, according to Curran, $2,850 remained a reasonable rental rate for the entire period applicable to the Motion. He also testified that Three Way is currently marketing the Office to potential tenants at that rate and has received serious interest from several of them. The Court found this testimony credible.

Because it was Imperial's burden to rebut the presumption that the Lease rate represents the fair value of the benefit to the estate for the stub rent period, the Court concludes that it has failed in its proof. Three Way is therefore entitled to an administrative expense of $919.30 for the stub rent period.

> *2. The Post-Stub-Rent, Pre-Expiration Period: February 1, 2011 through February 28, 2011*

The Court concludes that Three Way's administrative expense claim should include $2,850 in unpaid February rent. Imperial's obligation to pay its February rent arose on February 10; that is a post-petition obligation that Imperial should have timely performed under § 365(d)(3). When it did not, Imperial opened itself up to Three Way's administrative expense claim for $2,850, which, for the reasons discussed in Part B, the Court will allow under § 503(b).

    *3. The Post-Expiration, Pre-Rejection Period: March 1, 2011 through May 21, 2011*

There is no dispute that the Lease: (i) expired on February 28, 2011, or (ii) would have been deemed rejected by operation of § 365(d)(4) on May 21, 2011 (if it remained unexpired on that date). Typically when a lease expires, the tenant recognizes that it no longer has a right to use and occupy the premises and it vacates the premises. If the tenant does not vacate the premises, however, it may be considered a holdover tenant. The Lease here contained the following holdover provision:

> "If [Imperial] does not vacate the [Office] upon the expiration of the [Lease] [t]erm or earlier termination of [the] Lease, [Imperial's] occupancy of the [Office] will be a day-to-day tenancy, subject to all terms of [the] Lease…."

(TW Ex. 2 at 3.)

Because the Lease expired on February 28, 2011, there was no "unexpired lease" for Imperial to assume or reject in accordance with § 365(d)(4). That is why, "when a debtor is a holdover tenant under an expired lease, the claim is treated differently and falls under § 503(b)(1)(A)." *In re Kwik-Way Prod., Inc.* No. 08–00362, 2009 WL 807639, at * 3 (Bankr. N.D. Iowa March 23, 2009) (citing *In re Malden Mills Indus., Inc.*, 303 B.R. 688, 706 (B.A.P. 1st Cir. 2004)).

As discussed previously regarding the stub rent period, § 503(b)(1)(A) provides that the court shall allow administrative expenses only to the extent they represent "the actual, necessary

costs and expenses of preserving the estate ....” And, as discussed previously, the Lease rate is presumed to represent the fair value of the benefit to the estate for this period. Because Imperial failed to rebut this presumption (for the reasons noted previously), the Court concludes that Three Way is entitled to an administrative expense claim under § 503(b) at the per diem Lease rate for this period. Since Imperial occupied the Office for the entire months of March and April, Three Way’s administrative expense claim for each month is $2,850. The per diem rate in May is $91.93, which adds up to $1,930.53 from May 1 through 21.

So, for this period Imperial owes Three Way $7,630.53 in unpaid rent, which the Court concludes constitutes an allowable administrative expense claim.

### 4. The Post-Rejection[14] Period: May 22, 2011 to June 29, 2011

Both Imperial and Three Way agree that any entitlement Three Way may have to an administrative expense based on Imperial’s failure to vacate after May 21 must come from § 503(b)(1)(A). (TW Post-Hrg. Br. at 6; Imp. Post-Hrg. Br. at 8.) That is, both sides agree § 365(d)(3) no longer applies because § 365(d)(3) only applies pre-rejection. After rejection, however, a debtor’s continued use of the lessor’s property entitles the lessor to a post-rejection administrative expense claim under § 503(b)(1)(A), which is determined based upon the amount of benefit to the bankruptcy estate. *See In re Pyxsys Corp.*, 288 B.R. 309, 316-18 (Bankr. D. Mass. 2003) (allowing post-rejection administrative expense claim for unpaid rent under § 503(b)(1)(A)).

Again, as discussed previously, the contract rate is presumed to reflect the fair market rental value. *Home Interiors & Gifts, Inc.*, No. 08–31961, 2008 WL 4772102, at *11 (Bankr. N.D. Tex. Oct. 9, 2008). And, the fair market rental value, in turn, “sets the applicable rate of

---

[14] As noted previously, because the Lease expired on February 28, 2011, the use of this term is unfortunate – there was nothing left to reject. However, because the parties make a distinction with respect to the time period after the Lease would have been deemed rejected, the Court will too.

**Memorandum Opinion and Order**

administrative expense recovery in the post-rejection period." *Id.* (citing *In re DVI, Inc.*, 308 B.R. 703, 708 (Bankr. D. Del. 2004)).

And, as discussed previously, the Court finds that Imperial did not rebut that presumption. In short, Imperial's new facility does not appear to be comparable to the Office, and Three Way offered nothing to contradict Curran's testimony that $2,850 per month reflects the Office's fair market value. The Court will therefore add $3,674.30 to Three Way's administrative expense claim for the thirty-nine days from the May 21, 2011 "rejection date" to June 29, 2011, when Imperial finally vacated the Office. This amount is comprised of $919.30 in unpaid rent for the last ten days in May, calculated on a per diem basis at $91.93, and $2,755 in unpaid rent for the first twenty-nine days in June, calculated at $95 per day.

When the Court adds up the total amount of administrative expense claim determined to be appropriate for each period set forth above, it arrives at $15,074.13. If the Court subtracts from that amount the $1,440 Three Way credits for the value of Imperial's metal shelving (which Three Way sold in violation of the automatic stay), Three Way's final administrative expense claim is $13,634.13.

D.    **Three Way's "Restricted Access" Argument**

Imperial makes one final argument in an attempt to defeat Three Way's administrative expense claim, arguing that because it had to ask for Three Way's permission to access the Office, it did not truly use or occupy the Office post-petition and so the estate received no benefit. To support its argument, Imperial cites to *In re Ace Mortgage Funding, LLC*, No. 08–12645, 2011 WL 1585126 (Bankr. D. Del. April 27, 2011), in which the court held, in part, that a landlord was not entitled to an administrative expense for post-petition rent because the landlord had actively prevented the trustee from gaining access to the leased premises.

The Court disagrees for the reasons explained below. *Ace Mortgage* involved a post-petition lockout, where the landlord specifically told the trustee that it would not seek to recover post-petition rent. Later the landlord apparently changed its mind and sought to recover post-petition rent as an administrative expense. The trustee opposed the landlord's request, arguing that the debtor had effectively surrendered the premises. The *Ace Mortgage* court agreed, ruling that "the landlord [had] t[aken] possession of the premises and, for all intents and purposes, *prevented the [t]rustee from using [it]*." *Id.* at *5 n.5. As Three Way points out, the *Ace Mortgage* court took care to note that the situation it faced "fundamentally differe[d] from a situation where a debtor may not be actively using the premises, but still has access. Whether a landlord may have an administrative claim in such an instance is an issue for another day." *Id.*

From this Court's perspective, the *Ace Mortgage* case differs materially from the present case. Here, Three Way changed the locks on the Office nearly two months prior to Imperial's bankruptcy filing and tried to obtain control over the premises then. After losing in state court, Imperial filed for bankruptcy to prevent Three Way from evicting it. After Imperial's bankruptcy filing, Three Way never indicated a willingness to waive its right to post-petition rent. Three Way consistently urged Imperial to vacate the Office so that it could be re-let. *See* (TW Ex. 7, 8.) And, Three Way consistently argued that it "is entitled to the payment of rent as an administrative expense" until it got the Office back. (TW Ex. 6.) Moreover, Three Way did not actively prevent Imperial from using the Premises. The evidence establishes that virtually every time Imperial sought to access the Office, Three Way provided it access within twenty-four hours. Although Imperial's counsel attempted to contact Curran in early February 2011, February 28 was the first time Imperial explicitly requested access to the Office post-petition. (Imp. Ex. C.) Blanton got access the very next day. (*Id.*; Hrg. Tr. at p. 22: 16–18.) It was on

March 1, 2011 that Blanton went to the Office and discovered the missing furniture. Understandably upset, she left after a short time without packing everything up. Three Way then offered to allow Blanton back in on March 3, but she was unavailable until March 9, when Three Way again granted her access to the Office. After that, Imperial requested access to the Office on March 13, 25, 28, 30 and April 1. *See* (TW Ex. 7, 8; Imp. Ex D, E.) Three Way granted each request, typically responding to Imperial's emails within hours. (*Id.*) If anything, Three Way worked to accommodate Blanton's and Imperial's schedule, rather than the other way around.

Ultimately, Imperial's argument that Three Way denied it use of the Office because it had to request access from Three Way proves uncompelling for two reasons. First, the evidence shows that Imperial got access to the Office whenever it asked for it. Second, Imperial chose to do business this way. It chose to continue submitting requests to Three Way to get access to the Office. And it did so even when it might have come to the Court and gotten an order requiring Three Way to turn the keys back over to it. So, if Imperial's access to the Office was somewhat cumbersome, it is because Imperial failed to seek to compel the turnover of keys to the Office post-petition. The Court therefore rejects Imperial's restricted access argument.

## IV. CONCLUSION

For these reasons, the Court concludes that Three Way is allowed an administrative expense claim of $13,634.13.

**SO ORDERED.**

### End of Memorandum Opinion and Order ###